**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1801

JEFFREY A. JESSUP,

       Plaintiff – Appellant,

v.

BARNES GROUP, INCORPORATED,

       Defendant - Appellee.

Appeal from the United States District Court for the District of South Carolina, at Greenville. Henry M. Herlong, Jr., Senior District Judge. (6:18-cv-02703-HMH)

Argued: December 8, 2021                                 Decided: January 19, 2022

Before NIEMEYER, MOTZ, and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Niemeyer and Judge Richardson joined.

**ARGUED:** William Andrew Arnold, HORTON LAW FIRM, Greenville, South Carolina, for Appellant. Thomas Alan Bright, OGLETREE DEAKINS NASH SMOAK & STEWART, PC, Greenville, South Carolina, for Appellee. **ON BRIEF:** Jeremy R. Summerlin, HORTON LAW FIRM, Greenville, South Carolina, for Appellant.

DIANA GRIBBON MOTZ, Circuit Judge:

This appeal arises from the district court's grant of summary judgment to an employer on a former employee's claims of wrongful termination, failure to accommodate, and a hostile work environment in violation of the Americans with Disabilities Act ("ADA"). For the reasons that follow, we affirm the judgment of the district court.

I.

In 2000, Jeffrey Jessup began to work as a regional sales manager for one of the subsidiaries of the Barnes Group, Inc. ("Barnes"), "a global provider of highly engineered products, differentiated industrial technologies, and innovative solutions."[1] He eventually became a business development manager for another Barnes subsidiary. Jessup testified that he experienced "[s]ignificant" stress in this role. In October 2016, he suffered a panic attack. Following his panic attack, Jessup requested a leave of absence through January 18, 2017. Barnes approved that request. Jessup later requested an extension of his leave through June 13, 2017, which Barnes also approved.

During this leave, Jessup was prescribed a regimen of medication for depression and anxiety, underwent four to six months of therapy, started meditating, and developed relationships and activities outside of work. By March 20, 2017, he told his healthcare provider that his "general health" was the "best" it had been "in three to four years" and that he felt he had "the tools [he] need[ed] to go back to work." On April 1, 2017, about a

---

[1] In this appeal from a grant of summary judgment, we view the facts in the light most favorable to Jessup, the nonmoving party, and draw all reasonable inferences in his favor. *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019).

month and a half before his approved leave would end, Jessup returned to work. He alleges that, upon his return, Barnes subjected him to discriminatory treatment and a hostile work environment.

Less than two weeks after his return, Sean Foran — Jessup's supervisor — told him that Barnes had eliminated his position and would instead place him in a new position, referred to as a "corporate account manager" or "regional sales manager." Jessup viewed this new position as a demotion. Although his salary and benefits would not change, Jessup testified that he would be placed on a different incentive compensation program. He noticed during a conference call the next month that a new organizational chart listed his old position as "open" rather than eliminated.

Jessup testified in his deposition that, in "the middle of the year," Barnes also raised his sales quota by $2 million and that "[n]o one that [he] know[s] of has ever had two million dollars put on their plan in the middle of the year." Jessup believed Barnes raised his quota "to make [him] fall below plan and thus have reason to put [him] on a [performance improvement plan] or to terminate [him]."

Jessup's new supervisor requested a meeting with Jessup on July 21, 2017, "to discuss a few things." But on July 19, 2017, two days before the scheduled meeting, Jessup suffered another panic attack. Jessup emailed Human Resources to request leave through October 18, 2017. Although the record is not entirely clear, Jessup may have begun to take leave that day rather than wait for a response.[2] In any event, Barnes denied Jessup's request

---

[2] In his July 19, 2017 email requesting leave, Jessup noted that he had already "set an automatic 'Out of Office' e-mail reply [with instructions] to contact" his supervisor.

3

for leave, explaining that it could not grant the requested leave "without causing significant burden to the business." Barnes told Jessup to return to work by August 24, 2017, and to contact Human Resources if he "believe[d] some other change to [his] work environment would assist [him] in performing [his] job functions." He did not do so.

Instead, Jessup sent Barnes a new request for leave on October 17, 2017, now with a proposed end date of October 18, 2018. Jessup later claimed that the "October 18, 2018" date was a typo and that he had meant to request leave only through January 18, 2018. On November 17, 2017, Barnes' attorney sent Jessup's attorney a letter stating that Barnes had "decided to deny [Jessup's] request for additional leave and terminate [his] employment." In the letter, Barnes' attorney stated that, based on Jessup's latest leave request, it was "clear that he cannot return to work and perform the essential functions of his job, with or without accommodation." The letter also noted that Jessup "may have rights" under Barnes' short-term and long-term disability plans and that "those rights [would] be honored."

Jessup maintains that Barnes did not fire him in the November 17 letter and asserts instead that he formally remained on leave. He points out that after November 17, he retained his company car, cell phone, and laptop and that he continued to have IT access.

On January 9, 2018, a psychologist provided Barnes a return-to-work certification for Jessup, stating that he was "formal[ly] release[d] to return to full time employment, free of all medical restrictions." Just over a week later, on January 17, 2018, Barnes sent Jessup a letter as "official confirmation of [his] termination, effective November 17, 2017." The letter was backdated to January 8, 2018, the day before Barnes received Jessup's return-to-

4

work certification. The letter noted that Jessup had begun to take "leave on July 19, 2017" and had "been on leave ever since," and that his "medical issues" had "precluded [him] from performing the essential functions of [his] job."

II.

Jessup then filed a civil action against Barnes in South Carolina state court, alleging three ADA claims: (1) wrongful termination; (2) failure to accommodate; and (3) a hostile work environment. Barnes removed the case to federal court.

In his complaint, Jessup alleges that Barnes' treatment of him after he returned to work in April 2017 caused him to relapse and that he "has not been able to recover from this debilitating relapse into severe anxiety and major depression, and is now fully and completely disable[d] and unable to work." JA 22–23. In Jessup's deposition, Barnes' lawyer asked Jessup whether this allegation was "true at the time that [the] complaint was prepared and filed back in August of 2018," to which Jessup responded, "It is. It was true at that time and it's true as of today according to my doctors and therapist." JA 197. Barnes' lawyer then asked Jessup "at what point in time . . . [he] bec[a]me completely disabled and unable to work." JA 197. Jessup responded, "I think after the events, the hostile events that occurred between April 3 or 1st . . . until I went out on leave again on [July] 19th." JA 197.

Barnes then moved for summary judgment. The magistrate judge issued a report recommending that the district court grant Barnes' motion. The magistrate judge concluded that: (1) Jessup could not show that he was a "qualified individual," a required element of his wrongful termination and failure-to-accommodate claims, because he

5

admitted in his complaint and deposition that he had been unable to work since his relapse; and (2) Jessup failed to establish that Barnes' treatment of him was sufficiently severe or pervasive to succeed on his hostile work environment claim.

Jessup filed objections to the magistrate judge's report and recommendation. At that time, Jessup provided a sworn declaration stating that he "returned to work" on January 11, 2018, and that he would not have done so if he "had not been able to perform all of [his] duties." He declared that, during the week he returned, he completed a required training course, "cleaned up and responded to various emails," "had multiple conversations with [his] colleagues," "spoke to various customers," made "plans for a plant visit," "attended several conference calls," "worked on a request for [a] quote," and "[b]egan working on planning for 2018 sales and new customer development."

The district court adopted the magistrate judge's report in part and accepted the recommendation to grant Barnes' motion for summary judgment on all three claims. It held that, despite Jessup's declaration that he returned to work, Jessup still could not show that he was a "qualified individual" because he was bound by his allegation in the complaint and his subsequent confirmation of that allegation in his deposition. Unlike the magistrate judge, the district court did not reach the question of whether the conduct was sufficiently severe or pervasive to constitute a hostile work environment. Instead, it held that Jessup's failure to show that he was a "qualified individual" warranted granting summary judgment to Barnes on all three claims.

Jessup noted a timely appeal to this court. We review a district court's grant of summary judgment de novo. *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019). In

6

doing so, we apply the same familiar standard as the district court. *Id.* Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

III.

We first turn to Jessup's wrongful termination and failure-to-accommodate claims. To establish either a wrongful termination or a failure-to-accommodate claim under the ADA, a plaintiff must show that he is a "qualified individual." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344–45 (4th Cir. 2013) (quoting 42 U.S.C. § 12112(a)) (failure-to-accommodate); *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (quoting *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 273 n.9 (4th Cir. 2004)) (wrongful termination). The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). An ADA plaintiff bears the burden of demonstrating that he is a "qualified individual." *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 197 (4th Cir. 1997), *abrogated on other grounds by Baird ex rel. Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999).

The district court granted Barnes' motion for summary judgment on Jessup's wrongful termination and failure-to-accommodate claims on the same basis: that Jessup did not establish that he was a "qualified individual." We agree.

As the district court recognized, "[a] party is bound by the admissions of his [or her] pleadings." *Butts v. Prince William Cnty. Sch. Bd.*, 844 F.3d 424, 432 n.3 (4th Cir. 2016) (second alteration in original) (quoting *Lucas v. Burnley*, 879 F.2d 1240, 1242 (4th Cir.

7

1989)).  To bind a party, the admission must be "deliberate, clear, and unambiguous." *Everett v. Pitt Cty. Bd. of Educ.*, 788 F.3d 132, 141 (4th Cir. 2015) (quoting *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014)).

In his complaint and subsequent deposition testimony, Jessup admitted that at the time Barnes fired him, he could not perform the essential functions of his job.  Specifically, Jessup alleged in his complaint (filed in August 2018) that after his relapse in July 2017, he "*has not been able to recover* from this debilitating relapse into severe anxiety and major depression, and is *now fully and completely disable[d] and unable to work*."  JA 22–23 (emphasis added).  Jessup repeatedly affirmed those precise facts in his deposition, swearing that the statement that he was now "fully and completely disable[d] and unable to work":  (1) "was true at [the time he prepared and filed his complaint in August 2018]"; and (2) was "true as of [December 19, 2019, the date of his deposition] according to [his] doctors and therapist."  JA 197.  Jessup has thus admitted that he has been "unable to work" since his relapse and failed to suggest any reasonable accommodation that would have allowed him to do so, rendering him unable to show that he could perform the essential functions of his job at the time Barnes fired him.[3]

---

[3] Jessup also testified in his deposition that the conclusion that he was "fully and completely disable[d] and unable to work" had "been affirmed by the Social Security Administration."  He now argues that the Social Security Administration's affirmation that he was disabled does not estop him from showing he was a "qualified individual."  Of course, "[t]he mere act of applying for disability benefits does not estop a plaintiff from making a subsequent ADA claim," but "to avoid summary judgment, an ADA plaintiff who is shown to have claimed total disability in the context of another statutory scheme 'is required to proffer a sufficient explanation for any apparent contradiction between the two claims.'" *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001) (quoting *EEOC v.* (Continued)

8

Jessup attempts to avoid his admissions in two ways. First, he argues that the district court incorrectly paraphrased and thus misconstrued the relevant allegation in his complaint. He notes that the district court restated his allegation as stating that "he *had* been 'unable to recover' from his relapse . . . and that he was *still* 'fully and completely disable[d] and unable to work,'" whereas his actual allegation was that he "*has* not been able to recover . . . and is *now* fully and completely disable[d] and unable to work." (emphasis added). In doing so, Jessup apparently (but not explicitly) suggests that he was only unable to work at *certain points* — namely, at the time of his relapse, when he filed his complaint, and/or at the time of his deposition — but that he was not necessarily unable to work *at each point* since his relapse.

We cannot give Jessup's complaint that strained reading. Even viewing the facts in the light most favorable to him, there is only one reasonable reading of Jessup's admissions: that he has not been able to recover from his relapse in July 2017 and that this relapse has rendered him unable to work since then. *Cf. Thompson v. Gold Medal Bakery, Inc.*, 989 F.3d 135, 143 (1st. Cir. 2021) (holding that a plaintiff was not a "qualified individual" under the ADA because he made sworn statements that he "became unable to work . . . on May 8, 2016" and that, "as of the date of filing the [Social Security] application, August 23, 2016, he was '<u>still</u> disabled'"). Jessup's statement in his complaint and

---

*Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 378 (4th Cir. 2000)). Here, Jessup contends that the Social Security Administration "disregarded" his return to work in January 2018 because the return was not "long enough to reset his date of disability." Br. of Appellant at 21 n.6. We need not decide whether this explanation is adequate because Jessup's admissions establish that he could not prove a required element of his ADA claims.

9

subsequent confirmation of that statement in his deposition thus constitute deliberate, clear, and unambiguous admissions as to a material fact, defeating Jessup's contention that he was a "qualified individual" for ADA purposes.[4]

Jessup's second attempt to avoid those devastating admissions rests on the district court's asserted disregard of material evidence that he could perform the essential functions of his job at the time Barnes fired him. In particular, Jessup points to his sworn declaration that he returned to work for a week in January 2018. But for the purpose of summary judgment, "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Halperin*, 128 F.3d at 198 (alteration in original) (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)). For this very reason, in *Halperin v. Abacus Technology Corp.*, we held that a plaintiff could not show that he was a "qualified individual" in part because he admitted in his deposition that "he would not have been able to return to work for an additional five months," even though he later submitted an affidavit swearing that he was "ready and willing to work." *Id.* at 195, 197–98. So it is here.

Of course, if a plaintiff's declaration does not contradict his prior statements but instead "merely detail[s] and lend[s] context to" them, we do not disregard the declaration. *See Libertarian Party of Va. v. Judd*, 718 F.3d 308, 314 n.6 (4th Cir. 2013). But Jessup's

---

[4] To be sure, there is a genuine issue of fact as to the *date* that Barnes fired Jessup. Conflicting evidence suggests that the date of termination could be: (1) November 17, 2017; (2) January 8, 2018; or (3) January 17, 2018. But that issue is not *material*. According to Jessup's own admissions, he has been unable to work since July 2017, a period that necessarily includes all three possible dates of termination.

declaration does not merely detail or lend context to the admissions in his complaint and deposition that he has been unable to work since his relapse in July 2017. Rather, his declaration that he returned to work in January 2018 directly contradicts these earlier admissions.[5]

We thus affirm the judgment of the district court as to Barnes' wrongful termination and failure-to-accommodate claims. In doing so, we make no holding as to the other elements of those claims or as to whether Barnes' treatment of Jessup was proper. Our holding is limited and simple: admissions in pleadings bind a party; and here Jessup *has* bound himself by effectively admitting in his complaint and in deposition testimony that he is not a "qualified individual."

IV.

We now turn to Jessup's hostile work environment claim. To establish a hostile work environment claim under the ADA, a plaintiff must show that: "(1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis

---

[5] In addition to his declaration, Jessup also points to his January 2018 medical certification that he could return to work without restrictions as evidence that he could perform the essential functions of his job. Jessup correctly notes that, unlike the plaintiff in *Halperin*, he has submitted evidence besides his own declaration to show that he *could* perform the essential functions of his job. Nevertheless, Jessup remains bound by his own admissions. They require us to hold that Jessup is not a "qualified individual."

11

exists to impute liability for the harassment to the employer." *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001).

The magistrate judge recommended granting Barnes' motion for summary judgment on the hostile work environment claim because Jessup had failed to show that Barnes' treatment of him was sufficiently severe or pervasive. The district court accepted the magistrate judge's recommendation to grant summary judgment to Barnes on this claim, but on a different basis: that Jessup could not show that he was a "qualified individual" under the ADA.

The district court erred in basing its decision on its holding that Jessup could not show that he was a "qualified individual." Unlike his wrongful termination and failure-to-accommodate claims, Jessup's hostile work environment claim rests entirely on events that occurred *prior* to his relapse in July 2017. As a result, Jessup's admissions that he has been unable to work since his relapse would not prevent him from showing that he is a "qualified individual" for the purpose of his hostile work environment claim.

However, we may affirm a district court's grant of summary judgment "on any basis fairly supported by the record." *Lawson v. Union Cnty. Clerk of Court*, 828 F.3d 239, 247 (4th Cir. 2016) (quoting *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 222 (4th Cir. 2002)). In this case, we affirm because Jessup has failed to show that Barnes' treatment of him was sufficiently severe or pervasive to constitute a hostile work environment.

To show that conduct was sufficiently severe or pervasive to support a hostile work environment claim, a plaintiff "must demonstrate not only that he subjectively perceived his workplace environment as hostile, but also that a reasonable person would so perceive

it, i.e., that it was objectively hostile." *Fox*, 247 F.3d at 178. To determine whether a reasonable person would perceive an environment as hostile, a court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999)). "[A]n isolated incident of harassment, if extremely serious," can suffice to create a hostile work environment. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 268 (4th Cir. 2015) (en banc). But evidence of mere "rude treatment" or "callous behavior" ordinarily does not suffice. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008) (first quoting *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006); then quoting *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003)).

Jessup points to five actions and remarks that he asserts collectively establish a hostile work environment. These are:

- In February 2017, once Jessup was "nearing the point of return to work," he reached out to Tim Haller, the president of Engineered Components at Barnes, to discuss "next steps" and how he could have the "best chance of success for [his] return to work." Haller declined the requested meeting. Unbeknownst to Jessup at the time, Barnes' Director of Human Resources had advised Haller to decline the meeting, stating that meeting with Jessup "would be risky." The Director explained to Haller that, "[e]ven if [Haller] decided to let [Jessup] do all the talking and [Haller] only listened, it is not advisable because . . . it could further irritate him and be another thing he points to as . . . exacerbat[ing] his conditions."
- Upon returning to work in April 2017, his supervisor, Sean Foran, told Jessup that the company had eliminated his old position and would move him into a position that had a different incentive compensation program. Jessup later learned that the company listed his old position as "open."

13

- Once Jessup returned to work in April 2017, Foran also gave Jessup an overall rating of "Below Expectations" in his 2016 performance evaluation. Foran testified that he gave Jessup the rating in part because Jessup had "never developed [his] goals and objectives" for 2016, even though Foran admitted that Jessup "wasn't [at the company] to" develop those goals and objectives because he was on leave. Jessup requested that Foran meet with him to discuss his evaluation, but the record suggests that the two may not have met. Unbeknownst to Jessup at the time, Foran and others planned to present Jessup with a performance improvement plan after his negative evaluation.
- In May 2017, Haller told Jessup that he would have been a "risk" to Barnes in his old position because he could have had "a heart attack or stroke."
- At some time in mid-2017, Barnes increased Jessup's sales quota by $2 million.

In addition to the above actions and remarks, Jessup separately notes that in an April 2017 email from Foran to Barnes' Director of Human Resources, Foran stated that Jessup had gone "crazy" during the prior year and that his return was going to be a "train wreck" and "need[ed] to stop before it even [got] started." Jessup argues that the above events and statements "did not take place in a vacuum" but rather "occurred in the context of efforts by Jessup's supervisors and corporate human resources guided by Barnes' General Counsel to build a case for discharge against [him]." Br. of Appellant at 29. Jessup admits that he "did not know about the emails that documented" many of these "behind-the scenes machinations" but asserts that he "experienced hostility which flowed from the attitudes, intentions and schemes that were expressed in" those emails. *Id.* at 29-30.

Even when viewed cumulatively, the above statements and events do not show that the conduct Jessup experienced was sufficiently severe or pervasive to establish a hostile work environment. *See Fox*, 247 F.3d at 179 (holding that a plaintiff presented evidence of "objectively severe and pervasive workplace harassment" under the ADA where the

14

plaintiff had offered "a good deal of evidence that [his] supervisors[,] . . . in vulgar and profane language, constantly berated and harassed him and the other" workers with disabilities and that this harassment "occurred at least weekly").

Indeed, there is no evidence or even an allegation that Jessup knew about several of the above communications when he worked at Barnes, and so those communications cannot have contributed to his perception of a hostile environment. *Cf. Perkins v. Int'l Paper Co.*, 936 F.3d 196, 210 (4th Cir. 2019) ("[E]xperiences of third parties about which a plaintiff was unaware should not be considered in evaluating a hostile work environment's severe or pervasive requirement."). Statements or acts of which a plaintiff was unaware could of course be relevant to the separate question of whether the plaintiff experienced harassment *on the basis of his disability*, but they cannot show that a reasonable person would perceive his environment as objectively hostile *at that time*. *See King v. McMillan*, 594 F.3d 301, 310–11 (4th Cir. 2010).

To be sure, these statements and events indicate that Jessup's supervisors did not want him to keep working at Barnes. But on this record, when viewing the totality of the circumstances, there simply is not sufficient evidence of which Jessup was aware at the time to establish an objectively reasonable perception of a hostile work environment.

V.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*